Good morning. My name is George Ferides with Ryan Associates, appearing on behalf of the petitioner, Ranjit Kaur, to alternative spelling of the name is R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A-N-J-R-A I-T as listed in the asylum application, otherwise known as the I-589. Is this the same one where there was the same discrepancy on the passport? Yes, Your Honor. I will get to that shortly, if I may. The petitioner argues that in the present case the finding of the lower courts determining that petitioner's claims for asylum should be denied is improper for the following reasons. An adverse credibility finding must be supported by specific and cogent reasons, and the reasons for rejecting the testimony must be, must bear a legitimate nexus to the rejection. Furthermore, in the present case, the adverse credibility determination is not supported by substantial evidence, and being as this is a threshold issue in this case, the immigration judge were based merely on speculation and conjecture, which is also not an admissible reason for arriving at an adverse credibility finding. To go forward on the issue of the passport, for instance, the immigration judge speculated that it was not plausible for the Indian government to issue a passport that listed an alternative spelling, an alternative phonetic spelling of the petitioner's name as it was translated into English. However, there's also a problem with the binding of the passport. Yes, Your Honor. I believe the immigration judge also stated that there was some sloppiness on the passport that also was implausible. And why shouldn't we give deference to the experience of an immigration judge who presumably sees hundreds, if not thousands, of passports in the course of conducting these sorts of proceedings? Why is that an improper inference to draw from an item of evidence that is proffered as authentic when the judge questions its authenticity? Well, yes, Your Honor, that is a good point. I submit that, first of all, the petitioner testified openly and listed on her declaration to put the court on notice that there were alternative phonetic spellings of her name in English. Moreover, the immigration judge failed to consider. Of course, this would be a document that would be prepared presumably by a bureaucrat or an official of the Indian government, as opposed to someone whose primary language is English, is that right? Yes, Your Honor. And the petitioner also testified that she simply gave her name and that the officials spelled her name in that way. There's also evidence on the record. Is there evidence on the record that the name is spelled both ways in India? Yes, Your Honor. There's counsel for the petitioner at the lower level before the immigration judge say that this was a commonplace matter, that there are different phonetic spellings of the name in English. And there is also no ---- I keep saying in English, but I'm asking, presumably, the official in India who prepared the document, if it is, in fact, genuine, would have been familiar with the languages of that country. So why ---- I'm a little confused why you're drawing the distinction in English. Well, it is my understanding of this case that the issue is the translation of the Indian name and the Punjabi name into English. That is the question. Okay. And so is it your position that although the name is printed on an Indian government document, it's actually printed in English, as well as whatever the native language is? I believe so, Your Honor, if we look into the record. The issue, I think, is should that be pronounced, spelled J-I-T or J-E-E-T, when translated into the English alphabet from the Punjabi? Well, as listed in the asylum application, it is an alternative spelling. I believe that it can be spelled either way. Moreover, the immigration judge did not say that the identity of the petitioner was an issue in this case. Okay. But let's go to my second question, which is, frankly, a more serious concern of mine, and that is the judge's comment that the item of evidence that was proffered may not have been genuine because of the manner in which the passport itself was bound. Yes, Your Honor. There is no forensic report saying that this document is fraudulent. The immigration judge has speculated that it was implausible that this could be a genuine document. Counsel, we know that there are fraudulent passports that are proffered in connection with some immigration proceedings. Yes, sir. I don't know how long this immigration judge had been on the bench, but presumably an immigration judge with some experience has probably seen his or her share of false passports. So, again, my question is, why shouldn't we defer to the presumed expertise of the people who deal with these sorts of issues all the time and who presumably know a false document versus one that appears to be genuine? Well, I would just proffer that the petitioner has been consistent and straightforward with the immigration court. This is not an issue of testimony, Counsel. My question goes specifically to the corroborating piece of evidence which the petitioner offered, and that was a document which purports to be a genuine passport issued by the Indian government. Yes, Your Honor. And as I understand it, the fact finder looked at that document and had a serious question as to its authenticity because of the manner in which it was physically arranged. And why is that an improper basis for an immigration judge to question the authenticity and, in essence, to reject that item of evidence as not credible? I understand the Court's concern, and yet the immigration judge, even though he has substantial experience, perhaps, in this area, he did not state on the record that he has encountered such cases before or that he has any sort of authority on Indian passports. And, therefore, I believe that in light of the fact that there are no material consistencies in Petitioner's testimony, this alone cannot suggest that. Can I stay with the passport question for a minute? Yes, Your Honor. Is the issue whether or not the Petitioner is who she says she is? No, Your Honor. The immigration judge used the question of the passport to undermine Petitioner's credibility, not to substantiate a finding that he did not know who she was or that her identity was in question. And if the passport is false or isn't false, in what respect does it undermine her credibility? Because, I mean, what's the passport being offered to show, I guess? The passport, I suppose, is offered to show that she is who she is. And yet there are other – and yet the immigration judge did not explicitly make a finding that her identity was an issue. Was there other documents or other things in the record that established her identity? There is a lack of documentation in this case, Your Honor, but I do believe that her testimony alone substantiated her claim. And furthermore, as far as the passport is concerned, the immigration judge did not explicitly find that her identity was an issue. There are also other inconsistencies, actually not inconsistencies, but aspects of Petitioner's testimony that the I.J. claimed were not plausible. You know what I think may be the most helpful is why don't we hear from the government. You've got a minute, and then you can respond to what you hear the government say. Yes, Your Honor. Good morning, Your Honors. May it please the Court, and I'll ask Alicia Forrest for a respondent, John Ashcroft. The issue here is not the name of the passport, although the immigration judge did focus on it. She didn't have a passport. And the issue is why, if she's leaving India, she has a valid passport. She doesn't take it. She uses a phony one. She never produced the passport. She produced photocopies of three pages of the passport. And the photocopies showed that a photograph had been glued over some writing. So we don't have a passport here. The real question is, she left India. Why didn't she use the passport she had? There's nothing to indicate that she was being sought or she fled. And, in fact, her testimony is that she used a passport of somebody else. Is that right? Yes. Yes, Your Honor. And she didn't bring hers with her, and she destroyed that, I think, either in Germany or in Canada. I think the testimony is in Canada. In Canada. Okay. But the point is, here, we have someone who admits that she lies. I mean, there's no question that she lies, but she admits in her brief, and I will refer you to the bottom of page 7, over to 8, she says, about who started shooting first when the militants came to her home, which is the basis of her claim. And she says that if she had told the truth, she might not have been believed. This would affect her case. Wait a minute. Are we talking about if she had told the truth about what? About who shot first. That would affect her case. So she didn't tell the truth. She didn't tell the truth to whom? To the immigration judge, under oath, when this is her chance to make her claim. And you, can you point to that? I will refer you to. This is surprising to me, tell, because this may help me understand. Bottom of page 7. Bottom of page 7. And to her brief. Immigration judge. Can I go to the record, or do I have to go to the brief? Okay, well, the admission's in the brief, and the testimony's in the record, and it's referred to by the immigration judge that at first, she testified that she heard shots. Yes. And it wasn't until later, upon questioning by the immigration judge, that it turns out that it was her father who started shooting and not the militants. But what I'm specifically interested in is your statement that she says, if I had told the truth, I wouldn't have been believed. Where does she say that? Bottom of page 7. She worried what the effect. On her case, if she had said that her father had shot his gun. That's the brief. What's in the record? In the record. We've, you and I have gone through records of before. Don't laugh. Truly, I had every single page, and I left it in the hotel room. Okay. I am so sorry. And I was so ready for you. Yeah, yeah, yeah. I got you again. I can be a pain, and I apologize. But I'd love, because it's critical to me if she says, I told a lie. I'd like to see where she says I told a lie. It was, was it a bad page? I am so sorry to do this to you again. I was truly so ready for you. I'm sorry to do this to you, but here we are. I shouldn't. Where did she? 80? Thank you. Somebody's prepared here, and he wasn't. Okay. Okay, here we go. My father. What page are you on? Okay, we're on page 80. Page 80, age zero? On line 11. My father went inside. This is when the militants came. My father went inside, and suddenly I heard, I heard shots being fired. Yeah. I'm sorry, your father went inside, and then you heard shots? Yes. And you were in the kitchen? Yes. When we heard the sound of firing, the militants got nervous, and they came back. Indiscernibly, indiscernible back. Went after that, my father came out, he had his license gun. When they saw that gun with my father, they started fighting. Maybe firing? Fighting's an odd word. I would think so, but then here's the point. Thereafter, my father also started firing. So here she is indicating that militants shot first. It doesn't really matter, you know, because there's nothing wrong with her father shooting at people who are trying to attack them. Okay. But what I'm going to do, I read all this, and I was very familiar with it. You said, she said, I didn't tell the truth. Where does she say that? In her brief. She didn't write this brief. I'm interested in the record. Okay. In the record, she first, well, as the immigration judge found, the way she presented it was that her father shot second. It's not material to the claim, but it is material to her propensity to lie. Okay. I think where we are is she did not say, I didn't tell the truth because I didn't think I would be believed, unless you can show me where she said it. And I've read this transcript. Well, then let's go to how she misrepresented her case to the Canadian authorities and entering the United States. That's a different matter. Right. But still, she lied, and she admits that on the record. She tells. But that's not a lie in this proceeding, and, of course, we know it's very common for people who come into this country and thereafter, in deportation, are seeking asylum, they lied to get into the country. They all did. But she had already been, was in asylum proceedings in Canada. How do you know that? Because she's. No, it's quite unclear whether she was in asylum proceedings in Canada. She said, well, there were some applications, but I don't know really whether I was in asylum proceedings. She knew what she was doing, Your Honor. This woman is college educated. She's had one year of college. Three. Well, I won't look on the record for that. OK. Thank you. But the point is, she's not uneducated. She's not illiterate. She knew what she was doing. She planned leaving for eight months. And she comes to this. She lands in Canada. And she goes through proceedings. And. She goes through proceedings because, according to her testimony, she they say she doesn't have a passport. And they ask her all these questions. And they ask her to fill out some forms. And then she's asked here, well, did you apply for asylum? She's. I think she interprets that as a technical question. She said, well, I made some applications. I don't know whether I applied for asylum. Again, Your Honor, we have someone who is not illiterate, who is aided by a smuggler to get even into Canada. Right. She spends several hours going through an interview process. And she says, I didn't even look at the papers. I didn't know what I was filling out. OK. If you want to, that is not credible, first of all. But second of all, that's not the point. I don't think she said, I did not look at the papers. She said she doesn't know what was in them. That's a different question. She doesn't say she doesn't understand them. She's making a point. Well, her next step, however, Your Honor, and this is what's suspect, is she's no longer fleeing persecution. She's no longer fleeing India, even if she is to believe what be believed as to what happened before. What happens next is she gets to the border of the United States. She didn't want to flee persecution at this point. She wanted to enter the United States. Well, is someone required to seek asylum in the first country where they land? No. Well, actually, if you're really So we used to have a doctrine like that. I was going to ask that question. If you are fleeing persecution, you are fleeing a country. You are not necessarily going to a country. And that's the I don't know how long you have to. I mean, I think we used to have cases saying that you are supposed to seek asylum in the first country that where you're no longer being persecuted. But that was you may have to be there a while. I'm not sure. Well, if you're talking about from resettlement, that's another issue. But here we have the safe haven. There's nothing to indicate that she asked for safe haven, although it would appear that the interview process she went through was to determine and they released her. They didn't detain her. And which is, you know, with no documentation, I find that extraordinary. Part of the Canadian authorities. But anyway, they released her. She said she was going to go to a Sikh temple and stay there. And instead, she hooked up with her smuggler, spent the night with the family and then came to the United States on a borrowed passport. And she also says and again, she was not at this point fleeing persecution. She was coming to the United States, which was her goal all along. She would have another. And according to your argument, we should treat people differently depending on whether they land at LAX compared to whether they come into Vancouver. Well, again, it's the purpose, Your Honor. Are we fleeing persecution or are we coming to the United States? Well, for everyone who comes to the United States and seeks asylum, both things are happening. But she could have done it in Canada because the fraud continued. Although she was no longer fleeing persecution, she gets to the border and she's with another family and she presents that she has a passport with her and she lies to the immigration judge again because, again, a college educated person who is crossing the border, who has a passport in hand, she will look at that document and she will have to know what she lies to the immigration judge in saying what that she never looked at the passport. Well, she was holding someone else's passport. That is to say that her story is that she comes across the border. There's several people in the car all holding passports. She has a passport of one of the children in the family. And the story is we're coming across the border to buy gas. It's the border at Blaine and the immigration authority at the border lets them through without anything. Why should she look at that passport? She's holding it as it were as a dummy. I know that border very well. Well, it's the same thing that when she comes in, she knew the name on the false passport she used to get into Canada or at least to get out of India. She is going to look at that passport because in case she is asked at Blaine, she's going to have to know the name on the passport and the date of birth and the place of birth. She has to be prepared to answer that question. Yet under oath to the immigration judge, she would rather lie to aid all her smugglers than tell the truth. Her propensity for lying is clear here. May I have a moment to address the merits? Roberts. Okay. We get to, and I think I'm ready for you on this one on the page number, the, I believe it's 286, 236. I'm sorry. I lost my glasses in the taxi. I'm a little careless this trip. If I refer you to paragraph 71. I'm on paragraph 71 of? Page 236. 236. Okay. You believe that part of her story? Okay. Have you argued that in your brief that she should have resettled elsewhere in India? No, I'm asking something different.  She should have resettled safely elsewhere in India, and that is a ground for denying. Okay. It is a fact in this case. Moreover, another issue for lack of plausibility is although she bases her entire claim on the charges made against her father, she never even asks about what happened to her father. She hasn't heard from him since 1995, apparently talks to her mother and says, but they haven't, don't have any conversations about her father. In her initial testimony and in her declaration, she says, well, they went back to look for me in December 1995. We don't know why. And then she mentions that nobody's looking for her since. I mean, it's eight years later. We cannot say that if this incident happened, it was on account of. There's no medical corroboration for the fact that there was an encounter. If there was, it's horrific. But she hasn't. That may be, now that we have Ventura, that may be a determination for remand if we were to determine credibility. On this record, Your Honor, with all due respect, the immigration judge's reasons are based on substantial evidence. Okay. And the evidence does not compel a contrary conclusion. Thank you. And if I appear before you again, I will have my numbers. That's okay. Thank you. You've done very well in both arguments. Thank you. You probably will be appearing before us again. We look forward to it. Thank you, Mr. Forsman. You have a minute. Yes, Your Honor. Petitioner testified that she was arrested by the Indian police. She was severely beaten and kept in custody without due process. During her detention, she was brutally raped. This testimony was not questioned by the immigration judge. Instead, he decided to speculate that because she did not know her father's whereabouts, for instance, that her testimony was not credible. When she testified, she didn't even know if he was alive or dead. With regards to the gunshots, it's clear from the record that the militants asked, in addition to keys to some vehicle, for some money. It's implied from her testimony that when her father went into his bedroom to get the money, she heard a gunshot from within the bedroom. There's no evidence that anybody else was in the bedroom with her father, and therefore it is implied that he was the one who committed the first shots. There was no follow-up questions at that point during her direct testimony. On cross, she clarified her testimony that, yes, indeed, it was her father who fired the initial shot. Thus, she clarified her testimony, and she was credible on that point. With regards to her goings-on in Canada, she testified that she did exactly what her agent told her to say and do. He was the one who made all the arrangements for her, and she followed his directions and she obeyed his orders, whatever they were, as she was fleeing persecution. As far as future persecution, there's a presumption that she will suffer persecution if she was forced to return to India because she's established past persecution based on the forcible rape and the severe beatings she suffered in India. But wouldn't we have to remand that for the agency to, if we overturn the credibility finding, reach that issue? And lastly, I would like to also include that on many aspects of her testimony, any discrepancy, any purported discrepancies do not in any way enhance her claims and therefore should not be considered. And moreover, these issues raised here today, none of them materially affect her claim of persecution. They are peripheral and do not go to the heart of her sound claim. Thank you very much, both counsel. The case of Kaur v. Ashcroft is now submitted. The next case on the calendar is Schindler-Singh v. Ashcroft. Just in case Counsel Propel-Singh has arrived, we've put that case to the end of the calendar. We will hear it.
judges: Canby, W. Fletcher, Tallman